**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Arlynn Saldaña Cabán<br><br>          Plaintiffs,<br><br>               v.<br><br>Centro Médico del Turabo, Inc.,<br>D/B/A Hospital HIMA San Pablo<br>Bayamón; HIMA San Pablo Captive<br>Insurance Company; Dr. Carlo A.<br>Hernández Román; Puerto Rico<br>Medical Defense Insurance Company<br><br>          Defendants. | **Civil No. 22-1019 (GMM)** |

## OPINION AND ORDER

Pending before the Court is Plaintiff Arlynn Saldaña-Cabán's ("Plaintiff") request to exclude defendants' expert witnesses, Dr. Manuel A. Quiles-Lugo ("Dr. Quiles") and Dr. Carlos Gómez-Marcial ("Dr. Gómez"). (Docket No. 55). The Court **DENIES** Plaintiff's request.

### I.   PROCEDURAL BACKGOUND

On January 1, 2022, Plaintiff filed a Complaint against Centro Médico del Turabo, Inc. d/b/a Hospital HIMA San Pablo-Bayamón ("HIMA"), HIMA San Pablo Captive Insurance Company, Dr. Carlo Hernández Román ("Dr. Hernández"), and the Puerto Rico Medical Defense Company (together, "Defendants").[1] Plaintiff later filed an Amended Complaint ("Complaint") on April 22, 2022. (Docket No. 19). She claims that her late mother's wrongful death —that of

---

[1] As per the *Amended Complaint* at Docket No. 19.

María Luisa Cabán Colón ("Mrs. Cabán")— was caused by the negligence and medical malpractice of the defendants that treated her. (Docket No. 19 at 7-15).

On July 6, 2022, the Defendants filed their *Answer to Amended Complaint* denying all acts of negligence. (Docket Nos. 19 and 24).

Defendants later retained Dr. Quiles and Dr. Gómez as their expert witnesses to render an expert report and testify about Mrs. Cabán's cause of death, the applicable medical standards, and the deviations, or lack thereof, of care by Defendants. (Docket Nos. 55-4 and 55-8).

On February 4, 2023, Plaintiff filed a *Motion in Limine to Exclude Defense Experts [Dr. Quiles and Dr. Gomez]* ("Motion in Limine"). (Docket No. 55). Plaintiff mainly claims that Dr. Quiles' and Dr. Gómez's reports fail to meet the requirements of Fed. R. Evid. 702 and Fed. R. Civ. P. 26. More specifically, she claims the reports: (a) do not comply with Fed. R. Civ. P. 26(a)(2)(B) for failure to include the experts' statement of compensation; (b) are purely speculative with no basis on the medical record; (c) do not establish a national standard of care; and (d) lack reference to medical literature.

On March 1, 2023, Dr. Hernández and the Puerto Rico Medical Defense Insurance Company presented their *Response in Opposition to Plaintiff's Second 'Motion In Limine to Exclude Defense Experts'*

*(Docket No. 55) and Motion In Limine and For Sanctions* ("Dr.
Hernández's Response") (Docket No. 68). That same date, HIMA filed
its *[Motion] for Joinder and Reply in Opposition to Motion in
Limine* and joined in Dr. Hernández's Response. (Docket No. 69).
Defendants affirm that the expert reports complied with Fed. R.
Civ. P. 26(a)(2)(B) and that their findings are not speculative
(Docket No. 68 at 3-4).

## II.   APPLICABLE LAW

A.   <u>Federal Rule of Evidence 702</u>

Fed. R. Evid. 702 controls the admissibility of expert witness
testimony. *See* <u>Crow v. Marchand</u>, 506 F.3d 13, 17 (1st Cir. 2007)
("The touchstone for the admission of expert testimony in federal
court litigation is Federal Rule of Evidence 702."). The Rule
dictates:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if:
>
>> (a)   the expert's scientific, technical, or
>>       other specialized knowledge will help the
>>       trier of fact to understand the evidence
>>       or to determine a fact in issue;
>>
>> (b)   the testimony is based on sufficient
>>       facts or data;
>>
>> (c)   the testimony is the product of reliable
>>       principles and methods; and
>>
>> (d)   the expert has reliably applied the
>>       principles and methods to the facts of
>>       the case.

Civil No. 22-1019 (GMM)
Page -4-

Fed. R. Evid. 702. Thus, Fed. R. Evid. 702 assigns a "gatekeeping role for the judge" to ensure that the expert is "sufficiently qualified to assist the trier of fact" and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 597. To aid trial judges in their role as gatekeepers, the Daubert Court set forth several factors that may be taken into consideration, none of which are determinative: (i) whether a theory or technique can and has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether the particular scientific technique has a known or potential rate of error; and (iv) the "general acceptance" of a theory or technique. *See* Daubert, 509 U.S. at 593-94. Therefore, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). In this regard, "trial judges may evaluate data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011)

(*quoting* Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998)).

Note, however, the difference between an "unreliable" support and an "insufficient" support for an expert witness' conclusion. *See* Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022) (*quoting* Milward, 639 F.3d at 22). Whether the underpinning of an expert's opinion is insufficient is "a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury." Id. (*quoting* Milward, 639 F.3d at 22). Further, "[t]he proponent of expert testimony has the burden to show by a preponderance of the evidence it is reliable, not that it is correct." Robertson v. Iberia Comprehensive Community Health Center, Inc., Case No. 6:17-CV-01663, 2022 WL 4479204, at *2 (W.D. La. Sept. 26, 2022) (*citing* Johnson v. Arkema, Inc., 685 F.3d 452, 459 (5th Cir. 2012)).

Moreover, an expert "need not necessarily cite literature or a published standard in demonstrating that he has relevant expertise. . .instead, his personal experience alone may be sufficient." Irizarry-Pagan v. Metro Santurce, Inc., Civil No. 18-1532 (JAG), 2022 WL 4243567, at *4 (D.P.R. Aug. 8, 2022), report and recommendation adopted, (D.P.R. Aug. 31, 2022) (*citing* Delgado v. Dorado Health Inc., 14-CV-1735 (PAD), 2016 WL 4742257, at *4 (D.P.R. Sept. 2, 2016) (report and recommendation subsequently adopted in 2016 WL 4742259)). If an expert's testimony rests upon

"'good rounds,' based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." <u>Milward</u>, 639 F.3d at 15 (*quoting* <u>Daubert</u>, 509 U.S. at 590, 596) (internal quotations and citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Id.</u> (*quoting* <u>Daubert</u>, 509 U.S. at 596). Fed. R. Evid. 703 and 705 "place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination." <u>Toucet v. Maritime Overseas Corp.</u>, 991 F.2d 5, 10 (1st Cir. 1993) (*quoting* <u>Smith v. Ford Motor Co.</u>, 626 F.2d 784, 793 (10th Cir. 1980)) (internal quotations omitted).

Lastly, "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." <u>Id.</u> (*quoting* <u>Levin v. Dalva Bros., Inc.</u>, 459 F.3d 68, 78 (1st Cir. 2006)). Indeed, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. . .'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Fed. R. Evid. 702, Advisory Committee's note to 2000 amendment (*quoting* <u>United States v. 14.38</u>

Civil No. 22-1019 (GMM)
Page -7-

_Acres of Land Situated in Leflore County, Mississippi_, 80 F.3d 1074, 1078 (5th Cir. 1996)).

B.   <u>Federal Rule of Civil Procedure 26</u>

Fed. R. Civ. P. 26 requires from a party that intends to use a Fed. R. Evid. 702 witness at trial, to submit a written report. *See* Fed. R. Civ. P. 26(a)(2). The written report required by Fed. R. Civ. P. 26 must contain: a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; any exhibits that will be used to summarize or support them; the witness's qualifications, including a list of all publications authored in the previous 10 years; a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii), and (vi).

Further, Rule 26(e)(2) requires parties to timely supplement expert witness testimony if any changes to the expert's opinion arise:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2). Pursuant to Rule 26, a timely disclosure is one that is made at "the times and in the sequence that the court orders." Fed. R. Civ. P. 26 (a)(2)(D).

Failure to heed Fed. R. Civ. P. 26 need not result in the preclusion of the expert witness' testimony. Indeed, the Court, in its discretion, "may choose a less severe sanction." Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 78 (1st Cir. 2009) (*citing* Santiago-Diaz v. Laboratorio Clinico Y de Referencia del Este, 456 F.3d 272, 276 (1st Cir. 2006)).

### III.   DISCUSSION

The Court will address Dr. Quiles and Dr. Gómez's expert testimonies in turn.

A.   Dr. Quiles

1.   Qualifications

Dr. Quiles' has a medical degree from the University of Puerto Rico, Medical Sciences Campus, followed by training in internal medicine and cardiology at the Veterans Administration Hospital in Puerto Rico. (Docket No. 55-3 at 1). He has over 30 years of experience in internal medicine and has been certified by the National Board of Internal Medicine since 1988. (Docket No. 55-3 at 2). Currently, Dr. Quiles has medical privileges at the Hospital Pavía at Santurce, Puerto Rico. (Docket No. 55-6 at 13).

Civil No. 22-1019 (GMM)
Page -9-

His academic and professional background is sufficient for
the Court to conclude that he is qualified to testify in this
medical malpractice case and assist the tier of fact.

   2.   Dr. Quiles' Expert Report

Dr. Quiles rendered his expert report on October 11, 2022
("Dr. Quiles' Expert Report"). (Docket No. 55-4). Dr. Quiles
concluded that "[t]here were [ ] clear discrepancies in clinical
pictures and x-rays findings and autopsy reports, suggesting [ ]
new events. New trauma." (Docket No. 55-4 at 5). Further, Dr.
Quiles argues that "[HIMA] has protocols in place and followed all
the orders, medications and x-rays. They reread [sic] all the
studies and notified the physician involved. This was according
[to] the standard of care." (Docket No. 55-4 at 5). According to
Dr. Quiles, Mrs. Cabán "[m]ost probably. . .suffered a
cardiopulmonary event that could not be identified in the autopsy,
and resulted in her sudden death." (Docket No. 55-4 at 6). Dr.
Quiles posits that Mrs. Cabán was instructed to come back to HIMA
if new complaints develop and to obtain her x-ray results. (Docket
No. 55-4 at 5).

Dr. Quiles indicated that his opinion and conclusion is based
on his review of the following:

   1.   Complaint;
   2.   Medical Records of Mrs. Cabán in HIMA on February
        13, 2020;
   3.   Expert Report of Dr. Edwin Miranda Aponte;
   4.   Expert Report of Dr. Gómez;

     5.    Autopsy Report PAT 0723-20 performed by Dr. Carlos Chavez Arias;
     6.    Family Narrative performed by Plaintiff; and
     7.    Pertinent literature.

(Docket No. 55-4 at 1).

Dr. Quiles did not reference or cite HIMA's ER Protocol, medical literature, studies, or any authoritative scholarly source.

### 3.   Dr. Quiles' Deposition

Dr. Quiles was deposed on November 14, 2022. (Docket 55-6 at 1-2). When asked about the pertinent literature, Dr. Quiles mentioned that he generally reviewed Tintinalli for Emergency Medicine and Harrison for Internal Medicine to confirm his opinion. (Docket No. 55-6 at 25, 27). Dr. Quiles could not specify the edition or sections reviewed. (Docket No. 55-6 at 25-28).

Dr. Quiles further acknowledged the lack of reference in his report to HIMA's ER Protocol requiring that a patient with multiple traumas be completely undressed and examined, but maintains he indicated he reviewed it. (Docket No. 55-6 at 24 and 55-56). Dr. Quiles could not certify whether Mrs. Cabán was undressed during her examination: "I cannot say that because that is not in the medical record, and I only have the medical record. That's the standard of care. But that has to be asked by [sic] the doctor." (Doctor No. 55-6 at 58).

Regarding his conclusion that new trauma was most likely the cause of Mrs. Cabán's death, Dr. Quiles explained that there were clear discrepancies between the clinical pictures and x-ray findings, and the autopsy report. (Docket No. 55-6 at 52). When asked what the new trauma or event is, Dr. Quiles indicated he did not know; that it could be that Mrs. Cabán fell. (Docket No. 55-6 at 53). His basis for such statement is, again, an autopsy report that is "dramatically different to the multiple x-rays that [were] performed in the hospital." (Docket No. 55-6 at 53).

Lastly, Dr. Quiles identified the applicable standard of care as follows:

> [Dr. Hernández] identified a stable – a cardiovascular patient, and he performed multiple x-rays of the affected area. We have a blunt trauma, not an open trauma. And what he identified, he performed the proper x-ray of the affected area, and he discharged a stable patient with adequate hemodynamic and stable blood pressure, heartrate and saturation.

(Docket No. 55-6 at 67).

### 4. Dr. Quiles' Factual and Scientific Basis to Support His Expert Testimony

In Plaintiff's view, Dr. Quiles' opinion has "no factual or scientific basis to support it." The opinion propounded by [Dr. Quiles] is based on pure speculation and conjecture sprinkled with bad faith innuendo." (Docket No. 55 at 16, ¶ 39). The Court sees it differently. Dr. Quiles' conclusion is two-fold. First, Dr. Quiles found clear discrepancies between the x-rays taken of Mrs.

Cabán on February 13, 2020 and the autopsy report. Such discrepancies suggested to Dr. Quiles that "new events" and "new trauma" occurred between February 13, 2020 and her demise on February 16, 2020. Second, Dr. Quiles opined that Mrs. Cabán "most probably. . .suffered a cardiopulmonary event that could not be identified in the autopsy, and resulted in her sudden death." (Docket No. 55-4 at 6). This conclusion, irrespective of its probative value, is within the purview of Dr. Quiles' experience. Plaintiff is more concerned with the underpinning of said conclusion which she characterizes as "pure speculation", rather than one which is based on the medical record. In the Court's view, however, the factual underpinning of Dr. Quiles' conclusion is clear: that Mrs. Cabán's medical record of her emergency visit at HIMA does not match the autopsy report. This suggests, in Dr. Quiles' view, that something other than the February 13, 2020 accident (and by extension, Dr. Hernández's care of the injuries suffered therein) caused her death. In other words, Dr. Quiles' testimony is being offered to counter Plaintiff's contentions regarding Mrs. Cabán's cause of trauma, injury, and death. This is not unreasonable.

In a similar vein, Plaintiff's obligation under Fed. R. Evid. 703 is to explore the facts and assumptions underlying the testimony of Dr. Quiles. *See* Toucet, 991 F.2d at 10. As much, if Plaintiff believes that Dr. Quiles' testimony is shaky, uncertain,

or dubious, it is her duty to cross-examine him. Plaintiff could have done it at Dr. Quiles' deposition (and may still do it at trial). When asked about his opinion on whether this case is one of sudden death due to the unidentified cardiopulmonary event and new trauma, Dr. Quiles stated that "[Mrs. Cabán was] a patient with multiple other trauma, as described by her daughter; was talking with her, and she suddenly passed away." (Docket No. 55-6 at 55). No further questions were asked to Dr. Quiles as to his "sudden death" theory. Plaintiff cannot now call foul.

     5.   <u>Failure to Include the Applicable Standard of Care and Failure to Cite Relevant Authority</u>

     Plaintiff also argues that Dr. Quiles "does not even try to establish the national standard of care for the ER treatment of multiple trauma patients," and that he was unable "to cite [HIMA's] ER Protocol, or a single study, treatise, journal, article [,] or authority to support the 'sudden death claim' made in his report." (Docket No. 55 at 16-17, ¶ 40). Although this argument appears reasonable on its face, the First Circuit has recently made it clear in <u>Martínez</u>, *supra*, that that the <u>Daubert</u> standard in this circuit is less stringent. There, the expert witness did not flesh out the applicable standard of care nor referenced any outside source to support his opinion. *See* <u>Martinez et al. v. United States</u>*,* 16-CV-2430 (RAM), 2019 WL 3022497 at Docket No. 33-2 (D.P.R. July 10, 2019). The expert witness merely made references

to the "accepted clinical practice" and "departures" from "accepted medical practice." The First Circuit found that this was enough to prevent the exclusion of the expert witness. *See* Martínez, 33 F.4th at 27-29. Here, Dr. Quiles argued that the actions taken by HIMA and its personnel, were "according to the standard of care." (Docket No. 55-4 at 5).

Upon examining Dr. Quiles' Expert Report and his deposition transcript, the Court finds it sufficient, regardless of its probative value, to prevent its exclusion.

B.   Dr. Gómez

1.   Qualifications

Dr. Gómez's qualifications include a medical degree from the East Central University at Dominican Republic followed by a training in emergency medicine in the University of Puerto Rico. (Docket No. 55-7 at 1). He has over 30 years of experience in emergency medicine and is currently the Director of the Puerto Rico Medical Center Emergency Room. (Docket No. 55-7 at 1, 3).

Upon examining his academic and professional background, the Court concludes that he is qualified to testify in this medical malpractice case and assist the trier of fact.

2.   Dr. Gómez's Expert Report

Dr. Gómez rendered his expert report ("Dr. Gómez's Expert Report") on September 29, 2022. He concluded the following:

Civil No. 22-1019 (GMM)
Page -15-

1.   [Dr. Hernández] performed an adequate history in
     which [Mrs. Cabán] was fully oriented and explained
     that she impacted a fence.

2.   [Dr. Hernández] also performed a comprehensive
     physical examination on Mrs. Cabán and was able to
     identify the painful areas she expressed to have,
     which made possible for Dr. Hernández to order the
     appropriate X rays. In fact[,] he orders more than
     the routine "Trauma Series" according to the
     history and physical exam taken by Dr. Hernández.

3.   Dr. Hernández performed a preliminary or wet
     reading of the x rays he ordered and such readings
     would be compatible with the official x ray report
     read on February 14, 2020 by Dr. Iván Ramírez and
     Doctor Reinaldo Fornaris Paravasini, except for a
     small impacted intra-articular distal radial
     fracture.

4.   [Dr. Hernández] performed abdominal and thoracic
     exam and at the time and date of examination there
     were no seatbelt signs or evidence of any hematoma.
     These could have been a late finding which should
     have advised Mrs. Cabán[ ] or any family member to
     return to the emergency room which she failed to
     do.

5.   The autopsy findings were not consistent with the
     radiologic readings which allowed Dr. Hernández to
     evaluate Mrs. Cabán and discharge her in stable
     conditions.

6.   There is no note from paramedical personnel nor
     [Dr.] Hernández's evaluation of Mrs. Cabán, that
     she displayed any abnormal behavior, incoherent
     behavior or agitation.

7.   Dr. Hernández expressed that during Mrs. Cabán's
     lungs auscultation there were clear lungs which was
     confirmed by chest x ray. So[,] the autopsy finding
     of hemothorax was also a late finding.

8.   [Mrs. Cabán] presented stable vital signs on
     arrival to the emergency room and on discharge
     home.

9.    [Dr. Hernández] did order a cervical collar with
      which [Mrs. Cabán] left the hospital.

10.   . . .[Dr. Hernández] did not breach any medical
      standard and that Mrs. Cabán left the hospital
      premises in a stable condition.

(Docket No. 55-8 at 7-8). Dr. Gómez indicated that his opinion and

conclusion is based on his review of the following:

1.    Complaint;
2.    Answer to Complaint;
3.    Answer to Amended Complaint;
4.    First Set of Interrogatories;
5.    Answer and Objections to Plaintiff's "First Set of
      Interrogatories";
6.    Answer to First Set of Interrogatories;
7.    Expert Witness Report by Dr. Edwin Miranda Aponte
      of July 8, 2021;
8.    Medical Record of Mrs. Cabán from HIMA; and
9.    Forensic Report PAT 0723-20 of Mrs. Cabán.

(Docket No. 55-8 at 1). Also, Dr. Gómez posits that: (a) "[t]he

findings of [the] autopsy are inconsistent with the x ray findings

which [Doctor Hernández] had on the day of the accident on February

13, 2020"; and (b) "there is a huge difference on [the] type and

severity of lesions if one compares the radiography evidence versus

pathological findings." (Docket No. 55-8 at 5).

      3.   Dr. Gómez's Deposition

      Dr. Gómez was deposed on December 6, 2022. (Docket 55-9 at 1-

2). He explained the discrepancies between the x-ray and autopsy

findings. (Docket No. 55-9 at 92-95). He theorized that either:

(a) "[the fractures] could have not been present [at the time Mrs.

Cabán went to HIMA]"; or (b) "they were not evident at the time[,]

[b]ecause X-rays were taken and were negative concerning the fractures that the pathologist could see during the autopsy." (Docket No. 55-9 at 94). In other words, there is a possibility that new trauma was suffered by Mrs. Cabán or that fractures were "missed" due to the bones being complete yet impacted; and with movement separation of the fractures occurred. (Docket No. 55-9 at 94-95).

  4.  <u>Plaintiff's attacks as to the sufficiency of Dr. Gómez's Opinion</u>

Dr. Gómez listed 10 conclusions in his Expert Report. (Docket No. 55-8 at 7-8). While Plaintiff dedicates five pages of her Motion in Limine to attack the sufficiency of Dr. Gómez's opinions, explanations, and conclusions, she barely addresses the reliability of Dr. Gómez's methods.

For instance, Dr. Gómez's first conclusion is that Dr. Hernández performed an adequate patient history. Plaintiff rebuts by stating that Dr. Gómez's failed to explain "what an adequate history consists of, and what the standard of care in the practice of emergency medicine requires." (Docket No. 55 at 20, ¶ 51). Plaintiff then argues that Dr. Hernández's patient history pertaining to Mrs. Cabán lacked details such as the description of the wall impacted, including the wall's material; the speed of the vehicle at the time of the accident; the make and model of the vehicle; etc. (Docket No. 55 at 20 ¶ 52). This Court cannot

subscribe to the view that witnesses need to be pedant for their testimony to stand. Again, it is Plaintiff's obligation under Fed. R. Evid. 703 to explore the facts and assumptions underlying the testimony of the witness. *See* <u>Toucet</u>, 991 F.2d at 10. Moreover, whether the factual underpinning of Dr. Gómez's opinion is insufficient or weak is "a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury." <u>Martínez</u>, 33 F.4th at 24.

5.   <u>Failure to Include the Applicable Standard of Care and Failure to Cite Relevant Authority</u>

As with Dr. Quiles, Plaintiff argues that Dr. Gómez "does not establish the national standard of care" and that he was "unable to cite a single source to support his opinion." (Docket No. 55 at 32, ¶¶ 82-83). As stated, <u>Martínez</u> controls. Dr. Gómez stated that his expert opinion is "that [Dr. Hernández] did not breach any medical standard and that Mrs. Cabán left the hospital premises in a stable condition." (Docket No. 558 at 8). An integrated reading of his expert report in conjunction with his deposition testimony allows for the conclusion that the <u>Daubert</u> threshold is met. Dr. Gómez need not cite outsides sources for his expert testimony to stand.

**IV.   CONCLUSION**

The Court finds that Dr. Quiles' and Dr. Gómez's report and proffered testimony fulfill the requirements of Fed. R. Evid. 702,

**Civil No. 22-1019 (GMM)**
**Page -19-**

and meet the <u>Daubert</u> threshold. Plaintiff's in limine request is

DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this August 10, 2023.


<u>s/Gina R. Méndez-Miró</u>
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE