**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Arlynn Saldaña Cabán<br><br>Plaintiff,<br><br>v.<br><br>Centro Medico del Turabo, Inc., D/B/A Hospital Hima San Pablo Bayamón; Hima San Pablo Captive Insurance Company; Dr. Carlo A. Hernández Román; Puerto Rico Medical Defense Insurance Company<br><br>Defendants. | Civil No. 22-1019 (GMM) |

**OPINION AND ORDER**

Defendant Dr. Carlo A. Hernández-Román ("Dr. Hernández") and Puerto Rico Medical Defense Insurance Company ("PRMDI") (together, "Defendants") moved for summary judgment. (Docket Nos. 61 and 62). Dr. Hernández requests the Court dismiss the action premised on an alleged lack of evidence to prove causation between his intervention with a patient and her passing three days later. The Court DENIES Dr. Hernández's request.

**I. BACKGROUND**

On January 1, 2022, plaintiff, Arlynn Saldaña Cabán ("Plaintiff") filed an action for medical malpractice against Centro Médico del Turabo, Inc. d/b/a Hospital HIMA San Pablo-Bayamón ("HIMA" or "Hospital"), HIMA San Pablo Captive Insurance Company, Dr. Carlo Hernández Román ("Dr. Hernández"), and the

Puerto Rico Medical Defense Company (together, "Defendants").[1]
Plaintiff later filed an Amended Complaint ("Complaint") on April
22, 2022. (Docket No. 19). The Complaint seeks to recover damages
against Defendants pursuant to Articles 1802 and 1803 of the Civil
Code of 1930. *See* 31 P.R. Laws Ann. §§ 5141-5142.[2]

Plaintiff alleges that on February 13, 2020, her mother, the
late María Luisa Cabán Colón ("Mrs. Cabán"), was injured in a car
accident in which she was traveling as a passenger. (Docket No. 19
¶ 9). After the accident, Mrs. Cabán visited HIMA's the emergency
room ("ER"). (Id. 19 ¶ 10).

According to Plaintiff, during her time at the ER, Mrs. Cabán
complained of body pain, particularly the rib and stomach areas,
and was bleeding from an open wound on her hand that was never
treated. (Id. ¶ 14). Allegedly, no consults were made by Dr.
Hernández. (Id. ¶ 14). Despite this, Dr. Hernández discharged her.
(Id. ¶ 15). Dr. Hernández diagnosed Mrs. Cabán with post-traumatic
back pain and prescribed acetaminophen and Norflex. (Id. ¶ 15).
Moreover, according to Plaintiff, Dr. Hernández discharged Mrs.

---

[1] As per the *Amended Complaint* at Docket No. 19.
[2] This citation corresponds to the 1930 Puerto Rico Civil Code. The 1930 Puerto Rico Civil Code was abrogated by 31 P.R. Laws Ann. § 5311 et seq. ("2020 Puerto Rico Civil Code"). However, the 2020 Puerto Rico Civil Code provides that tort liability is governed by the law in force at the time when the act or omission that gave rise to the tort liability took place. See 31 P.R. Laws Ann. § 11720. The 1930 Puerto Rico Civil Code was in force when the events that gave rise to this malpractice case occurred.

Cabán without providing her with instructions. (Docket No. 19 ¶ 16).

The next day, Plaintiff claims, HIMA's radiologist read the radiograph of her left wrist and determined that Mrs. Cabán had suffered a radial fracture. Copies of the radiologist's reports were sent to Dr. Hernández for further management. Dr. Hernández did not contact Mrs. Cabán nor her relatives with information regarding the radiograph reports. (Id. ¶¶ 19 and 20). Mrs. Cabán died on February 16, 2020. (Id. ¶¶ 17-20).

In the autopsy report, Mrs. Cabán was found to have the following injuries: (a) trauma to the neck; (b) a fracture between the 6th and 7th cervical vertebrae with a softening of the underlying spinal cord; (c) a bilateral hemothorax; (d) pulmonary contusions; (e) right-sided retroperitoneal hemorrhage; (f) rib fractures; (g) a fracture of the sternum; (h) fractures of L-1 and L-2; (i) extensive areas with contusions in the thoracic and abdominal walls; (j) trauma to the extremities; and (k) contusions in both hands. (Docket No. 55-2 at 6). According to Plaintiff, Mrs. Cabán suffered the above injuries as a result of the February 13, 2020 automobile accident; and the injuries were left untreated by Dr. Hernández and HIMA's personnel. (Docket No. 19 ¶¶ 20-21).

Civil No. 22-01019(GMM)
Page -4-

## II.     SUMMARY JUDGMENT STANDARD

A.   Fed. R. Civ. P. 56

Fed. R. Civ. P. 56 governs motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute in a material fact "if the evidence 'is such that a reasonable jury could resolve the point in favor of the non-moving party.'" Taite v. Bridgewater State University, Board of Trustees, 999 F.3d 86, 93 (1st Cir. 2021) (*quoting* Ellis v. Fidelity Management Trust Company, 883 F.3d 1, 7 (1st Cir. 2018)). In turn, a fact is material "if it 'has the potential of affecting the outcome of the case.'" Id. (*quoting* Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).  In making its determination, the Court will look to "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. . ." Johnson v. University of Puerto Rico, 714 F.3d 48, 52 (1st Cir. 2013) (*citing* Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)).

The movant has "the initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Arroyo-Ruiz v. Triple-S Management Group, 258 F.Supp.3d 240, 245 (D.P.R. 2017) (*quoting* Campos v. Van Ness, 711 F.3d 243, 247-48 (1st Cir. 2013)). "Once the moving party has

properly supported [its] motion for summary judgment, the burden
shifts to the nonmoving party, with respect to each issue on which
[it] has the burden of proof, to demonstrate that a trier of fact
reasonably could find in [its] favor." Santiago-Ramos v.
Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)
(*quoting* DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).
Indeed, the non-movant is required to "present definite, competent
evidence to rebut the motion." Martínez-Rodríguez v. Guevara, 597
F.3d 414, 419 (1st Cir. 2010) (*quoting* Vineberg v. Bissonnette,
548 F.3d 50, 56 (1st Cir. 2008)).

Further, the Court must "draw [] all reasonable inferences in
favor of the non-moving party while ignoring conclusory
allegations, improbable inferences, and unsupported speculation."
Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013). The Court must
also refrain from engaging in assessing the credibility or weight
of the evidence presented. *See* Reeves v. Sanderson Plumbing
Products, Inc., 530 U.S. 133, 135 (2000) ("Credibility
determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those
of a judge."). Facts which are properly supported "shall be deemed
admitted unless properly controverted" and the Court is free to
ignore such facts that are not properly supported. Local Civ. R.
56(e); Rodríguez-Severino v. UTC Aerospace Sys., No. 20-1901, 2022
WL 15234457, at *5 (1st Cir. Oct. 27, 2022).

Civil No. 22-01019(GMM)
Page -6-

B.    Local Civ. R. 56

Local Civ. R. 56 also controls motions for summary judgment. *See* Local Civ. R. 56. In sum, it requires from the non-movant to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). If the fact is not admitted, "the opposing statement shall support each denial or qualification by a record citation. . ." Id. In its opposing statement, the non-movant can include additional facts supported by record citations. *See* Id. In turn, the movant "shall submit with its reply a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party." Local Civ. R. 56(d). In its statement, the movant shall admit, deny, or qualify those additional facts. *See* Id. Any denial and qualification that the movant raises must be supported by a record citation. *See* Id.

Failure to comply with Local Rule 56(c) gives the Court the ability to accept a party's proposed facts as stated. *See* López-Hernández v. Terumo Puerto Rico LLC, 64 F.4th 22, 26 (1st Cir. 2023); *see also* Natal Pérez v. Oriental Bank & Trust, 291 F.Supp.3d 215, 219 (D.P.R. 2018) ("If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted."). Litigants ignore Local Rule 56(c) at their own peril. *See* López-Hernández, 64 F.4th at 26.

Civil No. 22-01019(GMM)
Page -7-

### III.    FINDINGS OF FACT

The Court examined Defendants' *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* (Docket No. 62*), Plaintiff's Response to Defendant's Statement of Uncontested Material Facts, and Plaintiff's Statement of Additional Material Facts* (Docket No. 80-1), and *Defendants' Reply to Plaintiff's Opposition (Dkt No. 80) to Motion for Summary Judgment (Dkt No. 61)* (Docket No. 89).[3] Notably, Defendants utterly failed to contest *Plaintiff's Statement of Additional Facts* at Docket No. 80-1 at 9-27. Regardless, the Court only credits material facts properly supported by a record citation. Further, the Court reads the Complaint, in the light most favorable to the Plaintiffs and resolves any ambiguities in their favor. *See* Ocasio-

---

[3] Defendants claim that certain affidavits appended to Plaintiff's opposition at Docket No. 80 constitute a "sham." (Docket No. 89 at 5-7). As a general matter, "an affidavit is equivalent to other forms of evidence, such as deposition testimony." Ayala v. Kia Motor Corporation, Civil No. 19-1150, 2022 WL 4719541 at *3 (D.P.R. 2022) (*citing* 10A Wright & Miller, Federal Practice & Procedure § 2727 (3d ed. 2011)). However, when a party or an interested witness "has given clear answers to unambiguous questions in discovery, [they] cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, unless there is a satisfactory explanation of why the testimony [has] changed." Escribano-Reyes v. Professional Hepa Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016) (*quoting* Hernández-Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000)) (internal quotations omitted); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). This being said, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 26 (1st Cir. 2002); *see also* Shepherd v. Slater Steels Corp., 168 F.3d 998, 1007 (7th Cir. 1999) ("[W]here the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit."). Here, the affidavits proffered by Plaintiff merely amplify the facts of this case. Defendants made no showing that the affidavits contradict prior testimony. Note that the Court did not consider any inadmissible hearsay evidence contained in such affidavits.

Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011).

Accordingly, the Court makes the following findings of fact.

1.  At all relevant times, Dr. Hernández was and still is an individual duly licensed for the practice of medicine in the Commonwealth of Puerto Rico as an emergency room physician, with license number 12592. (Docket Nos. 62-1 ¶ 3; 80-1 ¶ 1).

2.  PRMDI had issued an insurance policy affording coverage to Dr. Hernández for the events alleged in the Complaint. (Docket No. 80-1 ¶ 2).

3.  On February 13, 2020, Mrs. Cabán visited HIMA's ER after suffering a car accident in which she was traveling as a passenger, approximately one hour before. (Docket No. 80-1 ¶ 3).

4.  The car in which Mrs. Cabán was traveling as a passenger crashed into a concrete wall near Santa Rosa Mall. (Docket No. 80-8 ¶ 4).

5.  Mrs. Cabán was registered at the Triage unit of the Hospital at 2:42:41 pm. (Docket No. 80-1 ¶ 4).

6.  According to HIMA's Triage report, Mrs. Cabán's chief complaint was that she suffered an automobile accident an hour before and was suffering from back and neck pain. (Docket No. 80-1 ¶ 4).

7.  At the time of the events, Mrs. Cabán was an 87-year-old female with a weight of 148 lbs. and a height of 5'3". Her blood pressure was 163/69, her pulse 73 and her respiration rate 15 with an oxygenation level of 99%. (Docket No. 80-1 ¶ 5).

8.  Dr. Hernández saw and evaluated Mrs. Cabán at 3:00 p.m. (Docket No. 80-1 ¶ 6).

9.  According to the Hospital records, Dr. Hernández conducted an evaluation and ordered several X-rays, including ones of the mandibula, the CS (cervical spine), the CxR (chest X-ray), the sternum, the LS (lumbo sacral spine), the pelvis, the left wrist, and the left hand. The reason provided for the X-ray studies ordered was "trauma." Dr. Hernández

also ordered the administration of 30 mg of Thoradol intramuscular and 60 mg of Norflex intramuscular and prescribed a soft cervical collar. (Docket Nos. 80-1 ¶ 6; and 62-2 at 1-4).

10.  According to the document titled 'Ticket to Ride' which is part of the Hospital's medical record, at 5:05 p.m. Mrs. Cabán was transferred to the radiology area for the first study which began at 5:25 p.m. She exited at 5:48 p.m. Mrs. Cabán was then returned to the clinical area at 6:00 p.m. The Hospital record registered that the patient was oriented. (Docket No. 80-1 ¶ 9).

11.  The X-Rays ordered by Dr. Hernández Román were performed by the Hospital as ordered, and interpreted by various radiologists the following day, February 14, 2020, when official reports were issued. (Docket No. 80-1 ¶ 10).

12.  The left wrist radiographs were taken with 2 views and were interpreted by Dr. Iván G. Ramírez Hernández. The official report on the radiographs was signed on February 14 at 7:39 a.m. The relevant findings were "a comminuted volar radial impacted intra-articular distal radial fracture." No definite distal ulnar fracture was identified. According to the report, a copy of the report was going to be sent to the referring physician for further management. (Docket No. 80-1 ¶ 11).

13.  Mrs. Cabán never returned to the Hospital. (Docket No. 80-1 ¶ 11).

14.  The sternal radiographs were taken with 2 views, interpreted by Dr. Ivan G. Ramírez Hernández, and the official report was signed on February 14, 2020, at 7:50 a.m. The report indicated that soft tissue swelling anterior to the sternum was found and no definite evidence of a sternal fracture was identified. Further, the report indicated that "the evaluation for sternal fracture is limited due to technique, if there is persistent clinical concern for sternal fracture further evaluation with chest CT with intravenous contrast is advised." (Docket Nos. 80-1 ¶ 12; 62-2 at 12).

15.  The lumbar spine radiographs were taken with frontal and lateral views, interpreted by Dr. Reinaldo J. Fornaris Paravisini and the official report was signed on February 14, 2020, at 9:51 a.m. The report indicated that no fractures or dislocations were seen, and the Doctor's impression was that the patient presented with no fractures or dislocations. According to the report, if there were any additional symptoms such as radiculopathy, a correlation with lumbar spine MRI should be considered. (Docket Nos. 80-1 ¶ 13; and 62-2 at 13).

16.  The chest radiograph was taken with posterior/anterior (PA) views, interpreted by Dr. Ivan G. Ramirez Hernández and the official report was signed on February 14, 2020 at 6:54 a.m. The report indicated that no radiographic findings of acute cardiopulmonary process were identified. (Docket Nos. 80-1 ¶ 14; and 62-2 at 14).

17.  The cervical spine radiographs were taken with frontal and lateral views, interpreted by Dr. Reinaldo J. Fornaris Paravisini and the official report was signed on February 14, 2020 at 9:54 a.m. The report indicated that there were no fractures or dislocations of the cervical spine. The report suggested that no fractures or dislocations of the cervical spine were present. The report also indicated that if clinical symptoms persisted further evaluation with CT or MRI of the cervical spine should be considered. (Docket Nos. 80-1 ¶ 15; and 62-2 at 15).

18.  The pelvis radiographs were taken with anteroposterior (AP) and frog leg views, interpreted by Dr. Pedro Collazo Ornes and the official report was signed on February 14, 2020 at 10:20 a.m. The report indicated that generalized osteopenia (bone loss) was found but that no evidence of fracture, subluxation or dislocation was identified. The report further identified the "absence of the posterior elements of L4 and L5 vertebral bodies, disc could be related to laminectomy versus congenital absence," and clinical correlation was recommended. (Docket Nos. 80-1 ¶ 16; and 62-2 at 16).

19. The mandible radiographs were taken with three different views, interpreted by Dr. Reinaldo J. Fornaris Paravisini and the official report was signed on February 14, 2020 at 9:54 a.m. The report indicated that no gross evidence of fractures or dislocations were identified and soft tissues were found to be within normal limits. The report indicated that if clinical suspicion remained high, further evaluation with dedicated maxillofacial CT scan should be considered. (Docket Nos. 80-1 ¶ 17; and 62-2 at 20).

20. The left-hand radiographs were taken with three different views, interpreted by Dr. Reinaldo J. Fornaris Paravisini and the official report was signed on February 14, 2020, at 9:57 a.m. Insofar relevant, the report indicated that a comminuted volar radial impacted intra-articular distal radial fracture was found but neither definite distal ulnar fractures nor radiocarpal dislocation were identified. The report indicated that orthopedic evaluation was advised. (Docket Nos. 80-1 ¶ 18; and 62-2 at 21).

21. Dr. Hernández reviewed the X-ray images pending the formal readings and reports by the radiologist the following day, reevaluated the patient and discharged her at 6:10 pm with a prescription for Norflex 100 mg and Acetaminophen 500mg. (Docket Nos. 80-1 ¶ 19; 62-2 at 3, 19; and 62-11 at 2-5).

22. At the time of her discharge, Mrs. Cabán's vital signs were stable. (Docket Nos. 80-1 ¶ 20; 62-4 at 19).

23. The diagnostic impression given by Dr. Hernández when he discharged Mrs. Cabán was that she suffered from "post-traumatic back pain" and presented with no fractures. (Docket No. 80-13 at 93-94).

24. Dr. Hernández had never seen the Hospital's "Manual de Protocolos Sala de Emergencia", the ER Protocol, or the ER Protocol's "Approach to Multiple Trauma/Wounded Patient Emergency Department Guideline." (Docket No. 80-13 at 114-115).

25. The ER Protocol requires medical care providers to rapidly and completely undress every trauma patient to uncover occult signs of trauma and to roll the patient as part of the examination. Dr. Hernández indicated that he did not do so. (Docket Nos. 80-13 at 118; 80-14 at 6).

26. The ER Protocol in its section titled "Rapid History" "Perform in less than 5 minutes" requires treating physicians to interview the patient, paramedics, friends, or family. Dr. Hernández does not recall interviewing the paramedics, friends, or family. (Docket Nos. 80-13 at 119; 80-14 at 6).

27. Dr. Hernández testified that the type of object with which a car collides affects the degree of potential injuries. In Dr. Hernández's view, the collision was most likely with a cyclone fence, which he did not specify in the medical record. (Docket No. 80-13 at 58-59).

28. The ER Protocol's "Secondary Physical Survey" that ideally ought to be performed in under 15 minutes requires that every inch of a patient's skin be inspected, and every bone palpated. According to the ER Protocol, it is necessary to put a finger, tube or scope into every orifice. Dr. Hernández testified that he palpated Mrs. Cabán, but he failed to put a finger, a tube or a scope in every orifice. (Docket Nos. 80-13 at 119-120; and 80-14 at 7).

29. The ER Protocol, under "Laboratory Data," requires physicians to obtain a hematocrit "in all patients with a significant traumatic mechanism of injury." Although the ER Protocol makes no exceptions, Dr. Hernández did not order the hematocrit laboratories because Mrs. Cabán's vital signs were "so fine." (Docket Nos. 80-13 at 123-124; and 80-14 at 8).

30. Dr. Hernández admits that in the "review of systems" of the emergency room record, he did not record Mrs. Cabán's complained of neck and back pain. (Docket No. 80-13 at 61-62).

31. Dr. Hernández did not document on the ER record any injuries to Mrs. Cabán's back, nor did he record

whether he turned the patient. Dr. Hernández recorded that Mrs. Cabán's back was hurting. (Docket No. 80-13 at 78).

32. Dr. Hernández did not observe a fracture of the left radius when evaluating the radiological studies made on Mrs. Cabán. (Docket Nos. 80-11 at 49; and 80-13 at 89-90).

33. Dr. Hernández did not record ecchymosis in Mrs. Cabán's right hand. (Docket No. 80-13 at 77).

34. Dr. Hernández discharged Mrs. Cabán without consulting the radiologists about the x-rays that he ordered. (Docket No. 80-13 at 83).

35. Dr. Hernández determined that Mrs. Cabán was stable before sending her home. (Docket No. 80-13 at 108).

36. The ER Protocol requires under "Repeat Physical Survey" that before a patient is discharged the physician must: "Perform another complete head-to-toe exam at a later time but before final disposition is made." The record does not reflect that Dr. Hernández performed the "Repeat Physical Survey" before discharging Mrs. Cabán. (Docket Nos. 80-13 at 125-126; 80-14 at 12).

37. Mrs. Cabán's discharge instructions are not signed by her nor by her relatives. (Docket Nos. 80-13 at 109-111; 80-15 at 52; and 80-11 at 41).

38. Dr. Edwin Miranda Aponte ("Dr. Miranda") is a general practitioner, grandfathered in emergency room medicine by reason of his work experience. He is not board certified in emergency room medicine nor in any other specialty. He retired from the practice of medicine in the year 2018 and does not maintain privileges at any medical institution. He does not have a medical practice and does not maintain professional liability insurance. (Docket No. 80-1 ¶ 22).

39. From 1994 until 2018, Dr. Miranda worked as an Emergency Department Physician at the Puerto Rico Medical Center in San Juan, Puerto Rico. (Docket No. 80-3 ¶ 4).

40. During Dr. Miranda's years of active practice at
    the Puerto Rico Medical Center, he held multiple
    posts including Emergency Room Director, Medical
    Services Department Director, Quality Assurance
    Program Director, and Risk Management Director.
    (Docket No. 80-3 ¶ 5).

41. Dr. Miranda acknowledged that the X-Rays ordered by
    Dr. Hernández were reviewed and reported by
    radiology specialists and that he had no reason to
    question their qualifications. (Docket No. 80-1 ¶
    23).

42. Dr. Miranda also admitted that all the orders given
    by Dr. Hernández were taken by the Hospital's
    staff. (Docket No. 80-1 ¶ 24).

43. Dr. Miranda stated that normal vital signs could be
    compatible with cervical vertebrae fractures,
    lumbar area fractures, sternum fractures, costal
    fractures and a bilateral hemothorax. (Docket No.
    80-2 at 40-41).

44. Dr. Miranda amended his expert report to state that
    the official X-Ray reports were not sent to Dr.
    Hernández but rather that they were going to be
    sent to the referring physician. He then admitted
    that there is no evidence that any of the official
    X-Ray reports were sent or provided to Dr.
    Hernández for his further review or action or that
    he ever saw the reports. (Docket No. 80-1 ¶ 27).

45. After Mrs. Cabán's discharge, she was taken home
    where she remained until the time of her death three
    days later. She never returned to or contacted the
    Hospital. (Docket No. 80-1 ¶ 28).

46. Dr. Miranda is unaware of whether Mrs. Cabán
    received any medical assistance at home before her
    passing, whether any paramedics were involved or
    whether she received treatment or attempted
    treatment while at her home before she was taken to
    the Forensic Institute. (Docket Nos. 80-1 ¶ 31; and
    62-4 at 27).

47. Dr. Hernández's work shift on February 13, 2020 ended at 11:00 p.m. and started the following day, February 14, 2020, at 12 p.m. (Docket No. 80-1 ¶ 34).

48. At the time the official radiology reports were issued, Dr. Hernández had finished his shift and was not at the Hospital. The radiology reports had to be delivered to the ER physician in charge or to the medical director if any action was then required. (Docket Nos. 80-1 ¶ 34; and 62-4 at 41).

49. Dr. Carlos A. Gómez Marcial ("Dr. Gómez") was appointed Medical Director of the Puerto Rico Medical Center's ER in 2017 and still serves in such capacity. He also served as ER's Medical Director of the Puerto Rico Medical Center for the years 1999 – 2016. (Docket Nos. 80-1 ¶ 35; and 62-7 at 3).

50. Dr. Gómez issued a report dated September 29, 2022 where he concluded that: (a) Dr. Hernández performed a comprehensive physical examination of Mrs. Cabán; (b) that at the time of the discharge of Mrs. Cabán, she was stable; and (c) that the autopsy findings were inconsistent with the radiological readings performed by the three independent radiologists. (Docket Nos. 80-1 ¶ 36; and 62-8 at 7).

51. Dr. Gómez acknowledged that in recording the history of the car accident in which Mrs. Cabán was injured, Dr. Hernández did not document the speed of the vehicle, the type of vehicle involved and the type of fence with which the vehicle collided. (Docket No. 80-15 at 84-86).

52. Dr. Manuel A. Quiles Lugo ("Dr. Quiles") is an internal medicine physician who is board certified in Internal Medicine. He has a subspecialty in cardiovascular disease, and he was board certified in cardiovascular medicine up until 2011. (Docket Nos. 80-11 at 12; and 62-9 at 2).

53. Dr. Quiles issued a report dated October 11, 2022. Dr. Quiles concluded that most probably the patient

suffered a cardiopulmonary event that could not be identified in the autopsy which resulted in her sudden death. (Docket No. 62-10 at 6).

54. The deposition of Plaintiff, Mrs. Cabán's daughter, was taken on July 18, 2022, via videoconference. She lives in Dallas, Texas, and was not in Puerto Rico at the time of the events. (Docket Nos. 80-1 ¶ 39; 62-3 at 2-5).

55. Plaintiff arrived in Puerto Rico on February 15, 2020 at 11:45 pm – 12 midnight. (Docket Nos. 80-1 ¶ 40; 62-3 at 6; and 80-12 at 48-49).

56. According to Plaintiff, Mrs. Cabán was "very, very, very sick" when she arrived at her home following her discharge. Mrs. Cabán, however, remained in her home until she passed. She was never taken to any other hospital, seen by any doctor or received any additional treatment. This was although. (Docket Nos. 80-1 ¶ 41; and 62-3 at 7-10).

57. According to Plaintiff, when she spoke to Mrs. Cabán the day before she arrived, Mrs. Cabán told her she was Ok. In Plaintiff's opinion, the night she arrived Mrs. Cabán looked very bad. (Docket No. 80-1 ¶ 42).

58. Mrs. Cabán passed on February 16, 2020, at 5:30 a.m. in her home. When she passed, Plaintiff was with her. (Docket No. 80-1 ¶ 44).

59. In the February 19, 2020, autopsy report, Mrs. Cabán was found to have the following injuries: (a) trauma to the neck; (b) a fracture between the 6th and 7th cervical vertebrae with a softening of the underlying spinal cord; (c) a bilateral hemothorax; (d) pulmonary contusions; (e) a right-sided retroperitoneal hemorrhage; (f) rib fractures; (g) a fracture of the sternum; (h) fractures of L-1 and L-2; (i) extensive areas with contusions in the thoracic and abdominal walls; (j) a trauma to the extremities; and (k) contusions in both hands. (Docket No. 55-2 at 6).

60.   The cause of death was reported as "Sever[e] trauma
      to the body." (Docket No. 55-2 at 7).


## IV.   APPLICABLE LAW

This is a diversity action. Accordingly, Puerto Rican
substantive law applies. *See* Roja-Ithier v. Sociedad Española de
Auxilio Mutuo y Beneficiencia de Puerto Rico, 94 F.3d 40, 43 (1st
Cir. 2005) (*citing* Erie R.R. Co. V. Tompkins, 304 U.S. 64, 92
(1938)). Puerto Rico law provides that "[a] person who by an act
or omission causes damage to another through fault or negligence
shall be obliged to repair the damage so done." 31 P.R. Laws Ann.
§ 5141. To prevail in a medical malpractice suit, a plaintiff must
establish three elements: "(1) the duty owed (i.e., the minimum
standard of professional knowledge and skill required in the
relevant circumstances), (2) an act or omission transgressing that
duty, and (3) a sufficient causal nexus between the breach and the
claimed harm." Cortes-Irizarry v. Corp. Insular de Seguros, 111
F.3d 184, 189 (1st Cir. 1997) (*citing* Lama v. Borras, 16 F.3d 473,
478 (1st Cir. 1994); Rolón-Alvarado v. Municipality of San Juan,
1 F.3d 74, 77 (1st Cir. 1993)).

"Puerto Rico holds health care professionals to a national
standard of care." Rojas-Ithier, 394 F.3d at 43. There is a
presumption that physicians exercised reasonable care. *See*
Martínez v. United States, 33 F.4th 20, 23 (1st Cir. 2022). As
such, a plaintiff "ordinarily must adduce expert testimony to limn

the minimum acceptable standard and confirm the defendant doctor's failure to meet it." Id. (*quoting* Cortés-Irizarry 111 F.3d at 190).

In terms of causation, a Plaintiff must prove by a preponderance of the evidence that the "negligent conduct was the factor that 'most probably; caused the harm to plaintiff." Marcano Rivera v. Turabo Medical Center Partnership, 415 F.3d 162, 168 (1st Cir. 2005). Plaintiff need not establish the above with mathematical accuracy. *See* Lama, 16 F.3d at 478. Lastly, "a jury normally cannot find causation based on mere speculation and conjecture; expert testimony is generally essential." Id.; *see also* Marcano Rivera, 415 F.3d at 168.

### V. ANALYSIS AND CONCLUSION

Defendants argue that the facts clearly establish that:

> (1) [Dr. Hernández] conducted a complete evaluation and ordered all required tests; (2) the preliminary review of the X-Ray images by [Dr. Hernández] did not reveal any of the fractures claimed by [P]laintiff that were only identified in the autopsy report six days later; (3) it is undisputed that [Mrs. Cabán] was stable at the time of the discharge; (4) the X-Ray reports, including spine, lumbar and frog leg positions reviewed and reported by three different independent radiologists concurred with [Dr. Hernández's] preliminary review and did not identify any of the fractures later mentioned in the autopsy report [six] days later; and (5) there is no causal relation between [Dr. Hernández's] limited intervention with [Mrs. Cabán's] and her death three days later.

(Docket No. 63 ¶ 25). Plaintiff, however, sets forth enough facts that successfully rebut Defendants' contention for purposes of summary judgment.

First, Plaintiff argues that Dr. Hernández failed to heed the Hospital's ER Protocol, which guides physicians in how to thoroughly evaluate and respond to patients with multiple traumas. Dr. Hernández's failure to heed the ER Protocol, Plaintiff posits, necessarily means that a complete evaluation was not carried out. For instance, Dr. Hernández: (1) did not completely undress Mrs. Cabán to uncover occult signs of trauma (Docket No. 80-13 at 118); (2) did not order the required hematocrit laboratories (Docket No. 80-13 at 123-124); (3) did not order a required CT-scan of the chest with intravenous contrast to rule out other possible injuries (Docket No. 80-13 at 91-92); and (4) did not perform another complete head-to-toe examination before the final disposition of Mrs. Cabán was made (Docket No. 80-13 at 124-126).

Second, Plaintiff argues that not only did Dr. Hernández fail to see the left radius fracture in the preliminary review of Mrs. Cabán's x-rays (Docket Nos. 80-11 at 49; and 80-13 at 88-89), but he also failed to order the optimal radiological studies needed to rule out or confirm any injuries that could not be identified through x-rays (Docket No. 80-13 at 91-92).

Third, even if Mrs. Cabán had stable vital signs, such fact, in and of itself, was insufficient to rule out any fractures or hemothorax that Mrs. Cabán could have suffered during the vehicle accident (Docket No. 80-2 at 40-41).

Fourth, Plaintiff's complaints precisely highlight Dr. Hernández's "limited" intervention which they find arguably resulted in Mrs. Cabán's death. Indeed, according to Plaintiff, Dr. Hernández failed to obtain crucial information and a proper history of the vehicle accident, that could have led to a complete and proper diagnosis of Mrs. Cabán's injuries (Docket Nos. 80-13 at 58-59; and 80-13 at 119). Also, at this juncture, there is no concrete evidence that Mrs. Cabán received discharge instructions prior to her leaving the hospital (Docket No. 80-13 at 109-110). Lastly, Plaintiff highlights that "[t]he facts [in this case] reflect an incomplete medical record from which 'no diagnosis whatsoever is inferred therefrom, and the warnings allegedly given [by the doctor] in the sense that the patient return if the condition persisted do not appear either.'" (Docket No. 80 at 18) (*quoting* Perez Cruz v. Hosp. La Concepcion, 115 D.P.R. 721, 15 P.R. Offic. Trans. 952, 972 (1984)).

All in all, if it is proven that Dr. Hernández's intervention departed from the applicable standards of care, his "limited" intervention may be found to be the reason for Mrs. Cabán's death. *See* Perez Cruz, 115 D.P.R. 721, 15 P.R. Offic. Trans. 952.

Because "[i]n a medical malpractice case, issues of deviation from the medical standard of care are questions of fact that must be decided by the jury," Defendants' Motion for Summary Judgment (Docket No. 61) is **DENIED**. *See* Cortes-Irizarry, 111 F.3d at 189.

Civil No. 22-01019(GMM)
Page -21-


          IT IS SO ORDERED.

          In San Juan, Puerto Rico, September 13, 2023.


                              s/Gina R. Méndez-Miró
                              GINA R. MÉNDEZ-MIRÓ
                              UNITED STATES DISTRICT JUDGE